THE MOLSONS BANK v. WOLF.

BILLS AND NOTES—BONA FIDE HOLDER—VIOLATION OF BLUE SKY LAW—NOTICE—NEGOTIABLE INSTRUMENTS LAW.

In an action by a bank on a promissory note, where it appears that plaintiff received said note before maturity as security for a loan without any knowledge or notice that it was given for stock sold in violation of the blue sky law, it was a *bona fide* holder and as such entitled to a directed verdict. 2 Comp. Laws 1915, §§ 6042, 6065, 6066, 6068, 6071.

Error to Genesee; Brennan (Fred W.), J.    Submitted June 13, 1923.    (Docket No. 52.)    Decided October 1, 1923.

Assumpsit by The Molsons Bank against Charles Wolf on a promissory note.    Judgment for defend-

On questions relating to application of blue sky laws, see notes in 15 A. L. R. 262; 24 A. L. R. 523.

ant on a directed verdict.    Plaintiff brings error.    Reversed.

*Van Dyke, O'Brien & August (Stevenson, Carpenter, Butzel & Backus,* of counsel), for appellant.

*S. S. Pearlstine (George W. Cook,* of counsel), for appellee.

MOORE, J.    On April 4, 1922, this suit was brought to recover a judgment on a note reading as follows:

> "THE MOLSONS BANK,
> Windsor, Ontario.
>
> "Prin.    $4000.00
> "Int.        73.65
> "Amt.      4073.65
> "Due November 26, 1920.
> "Windsor, Ont., August 23, 1920.
> "Three months after date I promise to pay to the order of Fisher-Wilkie, Limited, at the office of the Molsons Bank here the sum of four thousand and 00-100 dollars for value received with interest at 7 per cent. per annum both before and after maturity until paid.
>
> "CHARLES WOLF.
>
> "Indorsed on the back:
> FISHER-WILKIE, Limited,
> HERMAN FISHER, V. P.
> August 23-20."

This note was a renewal of a note of like amount and like form given in May, 1920.

The defendant filed the plea of the general issue with notice of alleged defenses.    Later an amended plea was filed in which it was claimed:

1. That the said plaintiff is not a *bona fide* holder in due course, viz.: It was not the owner of said note, had paid no consideration therefor, and had knowledge of the legal defenses to said note.

2. That there was no valid or legal consideration for the giving of said note.

3. That the payee in said note was a foreign corporation organized under the laws of the Province of Ontario and doing business at Windsor, Ontario; that said payee, being a foreign corporation, was never authorized or empowered by the Michigan securities commission as required by law, to sell its corporate stock in the State of Michigan; that said payee at the city of Detroit, in the State of Michigan, sold to defendant the capital stock of said corporation to the amount of $5,000 and said defendant gave to said corporation his note as part payment therefor; that the sale of said stock was void and there was no consideration for said note, all of which said plaintiff had knowledge.

At the conclusion of all the testimony each party asked for a directed verdict. The trial judge directed a verdict in favor of the defendant. The case is here for review on writ of error.

The Fisher-Wilkie company was a corporation that had a foundry and machine shop in Sandwich, Ontario. The defendant became interested in the corporation through its president, Mr. Fisher. The defendant's version of what occurred is as follows:

"My place of business is Flint. Have lived here eight years. My business is hardware and tools. I have known Mr. Fisher for about nine years and on or about the 20th day of May, 1920, I had some business dealings with him in the Vinton building in Detroit, Michigan. At that time he was selling stock in the Fisher-Wilkie, Ltd., and I bought $5,000 worth of stock in the Fisher-Wilkie, Ltd., of Windsor. I gave a check for $500, signed a note for $500 and then signed another note to the Fisher-Wilkie for $4,000. I gave the note for $500 to Roy Fisher. It was payable to him.

"I never received the stock. My wife was with me at the time the note was given. I had never seen this plant before that but saw it on the following day when I was taken there by Mr. Fisher, and later went to the Molsons Bank in the afternoon and met Mr. Bieber who said: 'I want to congratulate you. You got into a good company.' Mr. Fisher said:

'I sold him stock over in Detroit yesterday.    He is to pay $1,000 and a note for $4,000.'    Bieber said: 'You got into a very good company because we are right behind it financially, this bank.'    I was later notified that the bank had not rediscounted my note."

No stock was issued to Mr. Wolf.    The record shows he was not to have the stock until it was paid for, but that it was issued and held either in the treasury or in the bank.    The occasion of Mr. Wolf and Mr. Fisher's going to the bank was to see if the bank would discount the note.    The note was indorsed in blank by the payee and left with the manager of the bank, who informed Mr. Wolf and Mr. Fisher that he would not decide about discounting the note until he made inquiries about Mr. Wolf.    The manager later notified them he would not discount the note and an arrangement was made that it would be held as collateral security for the payment of the debt, present and future, of the payee.    The note was then in the possession of the bank and had been indorsed in blank.    A paper was then drawn, the material parts of which are as follows:

"Assignment of contracts, notes or bills to The Molsons Bank.

"The contracts, notes and bills mentioned below amounting to $11,883.15 and the principal and interest thereon express payable and all renewals thereof and substitutions therefor are hereby transferred to the Molsons Bank, which is authorized to hold the same and proceeds thereof as collected as a special collateral security fund for the payment of all present or future indebtedness or liability of the undersigned to the bank.    *    *    *

"At any time when any debt or liability of the undersigned to the bank shall be overdue the bank may sell the said contracts, notes and bills or any of them *    *    * and the moneys received by the bank on such sales shall form a part of the said collateral security fund.

224—Mich.—34.

"The bank may at any time compound with or release or grant renewals to any of the parties liable on said contracts, notes or bills.

"Any expenses incurred by the bank in connection with the contracts, notes or bills shall be a first charge ˙ on the said fund and in the event of said fund proving insufficient such expenses shall be made good to the bank by the undersigned.

"The funds shall remain in the hands of the bank until all indebtedness of the undersigned is paid but the bank may apply any part of it in payment of any particular debt if it sees fit.  *  *  *

"Dated at Windsor, Ontario, June 12, 1920.
(Signed)  "FISHER-WILKIE, Ltd.,
"ROY FISHER,
President.
"G. T. MEARS,
Asst. Secretary and
Treasurer."

Among the notes listed was the original note given by Mr. Wolf. At this time there is no claim that Mr. Fisher, Mr. Wolf, or the manager of the bank, knew that the stock was sold in violation of the blue sky law of Michigan. As already appears, the original note was not paid and defendant renewed it by making the note sued upon and by sending to the bank the amount of accrued interest.

We have already given the version of defendant. We now quote some of the testimony of the manager of the bank:

"Plaintiff's Exhibit E is the Fisher-Wilkie account. I was in charge of the bank during the time the entries were made on these deposit accounts including Exhibit E up to June 2, 1921. As long as I was in charge these accounts were kept accurately. On June 2, 1921, the amount of the Fisher-Wilkie overdraft was $6,308.89. The past-due bill register was kept under my charge until I left the bank and was kept accurately during that time. I do not recall the conversation which took place between me and Mr. Fisher at the time he brought the original note. He did not tell

me about the provisions of the Michigan blue sky law. I did not know about the Michigan blue sky law at that time; did not know about it either on May 20 or June 12, 1920. I never heard of the Michigan securities commission on these dates. Later on Mr. Fisher told me about this. Mr. Fisher did not tell me either when the note was brought in first or later on when the collateral agreement was signed, that the stock had been sold in Michigan. · I was not told that there were any defects in this note, or that there were any defenses to it; or that there were any claimed illegalities concerning it. I had no suspicions regarding the note on either of the above dates or at any time between those dates."

Later the corporation of Fisher-Wilkie became insolvent and passed into the hands of the court. It at this time was a very large debtor of the bank. The record is entirely barren of any testimony that the bank had any knowledge of any invalidity in the transaction in relation to the sale of the stock by Mr. Fisher to Mr. Wolf. Indeed, the testimony of Mr. Fisher and Mr. Wolf is that neither of them knew it was unlawful to sell the stock.

Some provisions of the negotiable instruments act, so-called, are germane to the situation before us. We shall not quote these provisions but cite sections 6042, 6065, 6066, 6068 and 6071, 2 Comp. Laws 1915. We think it should be said as a matter of law upon this record that the bank was a *bona fide* holder before maturity for value of the note sued upon and that a verdict should have been directed for the full amount of the note. See *Drovers' National Bank* v. *Potvin,* 116 Mich. 474; *Graham* v. *Smith,* 155 Mich. at p. 68; *City of Adrian* v. *National Bank,* 180 Mich. at p. 180 (Ann. Cas. 1916A, 600) ; *Van Slyke* v. *Rooks,* 181 Mich. at p. 95.

The judgment is reversed and a new trial ordered.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, SHARPE, and STEERE, JJ., concurred.